**Albert N. Kennedy**, WSBA No. 15074
(Lead Attorney)
   Direct Dial: (503) 802-2013
   Facsimile: (503) 972-3713
   E-Mail: al.kennedy@tonkon.com
**Timothy J. Conway**, Admitted *Pro Hac Vice*
   Direct Dial: (503) 802-2027
   Facsimile: (503) 972-3727
   E-Mail: tim.conway@tonkon.com
**Michael W. Fletcher**, Admitted *Pro Hac Vice*
   Direct Dial: (503) 802-2169
   Facsimile: (503) 972-3869
   E-Mail: michael.fletcher@tonkon.com
**TONKON TORP** LLP
1600 Pioneer Tower
888 S.W. Fifth Avenue
Portland, OR 97204

Attorneys for Debtor

| | |
|---|---|
| Judge: | Paul B. Snyder |
| Chapter: | 11 |
| Hearing Location: | ~~Vancouver~~Tacoma, WA |
| Hearing Date: | Jan. 13, 2010 |
| Hearing Time: | 9:00 a.m. |
| Response Date: | Jan. 6, 2010 |

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

Tacoma Division

In re

The Columbian Publishing Company,

Debtor.

Case No. 09-43133-PBS

**DEBTOR'S ~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT (~~NOVEMBER~~DECEMBER 1~~3~~, 2009)**

## I. INTRODUCTION AND SUMMARY OF PLAN

### A. INTRODUCTION

On May 1, 2009 (the "Petition Date"), The Columbian Publishing Company ("Debtor" or "The Columbian") filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). On ~~August 27~~December 1, 2009, Debtor filed its ~~initial~~proposed Second Amended Plan of Reorganization (the "Plan") with

**Page 1 of 50** —DEBTOR'S ~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT (~~NOVEMBER~~DECEMBER 1~~3~~, 2009) - 1 of 50
In re The Columbia Publishing Company, Case No. 09-43133-PBS

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

Case 09-43133-PBS   Doc 182-1   Filed 12/01/09   Entered 12/01/09 16:34:14   Page 1 of 50

1　the Bankruptcy Court.  This Disclosure Statement describes various transactions

2　contemplated under the Plan, including the manner in which Claims and Interests will be

3　satisfied.  A copy of the Plan is attached hereto as Exhibit 1.  You are urged to review the

4　Plan and, if appropriate, consult with counsel about the Plan and its impact on your legal

5　rights before voting on the Plan.  Capitalized terms used but not defined in this Disclosure

6　Statement shall have the meanings assigned to such terms in the Plan or the Bankruptcy

7　Code.

8　　　　　The purpose of this Disclosure Statement is to provide adequate information

9　of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and

10　history of Debtor and the condition of Debtor's books and records, that would enable a

11　hypothetical reasonable investor typical of holders of Claims or Interests of the relevant

12　Class to make an informed judgment concerning the Plan.

13　　　　　This Disclosure Statement has been prepared by Debtor in good faith based

14　upon information available to Debtor and information contained in Debtor's books and

15　records.  The information concerning the Plan has not been subject to a verified audit.

16　Debtor believes this Disclosure Statement complies with the requirements of the Bankruptcy

17　Code.

18　　　　　The statements contained in this Disclosure Statement are made as of the date

19　hereof, unless another time is specified herein, and the delivery of this Disclosure Statement

20　shall not imply there has been no change in the facts set forth herein since the date of this

21　Disclosure Statement and the date the material relied on in preparation of this Disclosure

22　Statement was compiled.  The description of the Plan contained in this Disclosure Statement

23　is intended as a summary only and is qualified in its entirety by reference to the Plan itself.  If

24　any inconsistency exists between the Plan and this Disclosure Statement, the terms of the

25　Plan are controlling.  Each holder of a Claim is encouraged to read, consider and carefully

26　analyze the terms and provisions of the Plan.  This Disclosure Statement may not be relied on

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1 for any purpose other than to determine how to vote on the Plan. Nothing contained herein

2 shall constitute an admission of any fact or liability by any party, or be admissible in any

3 proceeding involving Debtor or any other party, or be deemed conclusive advice on the tax or

4 other legal effects of the reorganization on the holders of Claims or Interests.

5    This Disclosure Statement is submitted in accordance with Section 1125 of

6 the Bankruptcy Code and Bankruptcy Rule 3016. The Bankruptcy Court has scheduled a

7 hearing on confirmation of the Plan to commence on ~~    ~~January 13, 20~~09~~10

8 at ~~  ~~9:00 a.m. Pacific Time. That hearing will be held at the United States

9 Bankruptcy Court for the Western District of Washington,

10 ~~      ~~1717 Pacific Avenue, Tacoma, Washington 98402,

11 before the Honorable Paul B. Snyder. The hearing on confirmation may be adjourned from

12 time to time by the Bankruptcy Court without further notice, except for an announcement

13 made at the hearing or any adjournment thereof.

14    A ballot has been enclosed with this Disclosure Statement for use in voting on

15 the Plan. In order to be tabulated for purposes of determining whether the Plan has been

16 accepted or rejected, ballots must be received at the address indicated on the ballot no later

17 than _____ __.m. Pacific Time on _____ ___, 20~~09~~10. Debtor believes

18 confirmation of the Plan is in the best interest of Debtor's Creditors and urges you to vote to

19 accept the Plan.

20   **B.**  **BRIEF EXPLANATION OF CHAPTER 11**

21    Chapter 11 of the Bankruptcy Code is the principal reorganization provision

22 of the Bankruptcy Code. Pursuant to Chapter 11, a debtor attempts to reorganize its business

23 for the benefit of the debtor, its creditors and other parties in interest.

24    The formulation and confirmation of a plan of reorganization is the principal

25 purpose of a Chapter 11 case. A plan of reorganization sets forth a proposed method for

26 compensating the holders of claims and interests in the debtor. A claim or interest is

**Page 3 of 50** —DEBTOR'S ~~FIRST~~SECOND AMENDED DISCLOSURE
STATEMENT (~~NOVEMBER~~DECEMBER 1~~3~~, 2009) - 3 of 50
In re The Columbia Publishing Company, Case No. 09-43133-PBS

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1 impaired under a plan of reorganization if the plan provides that the legal, equitable or

2 contractual rights of the holder of such claim or interest are altered. A holder of an impaired

3 claim or interest is entitled to vote to accept or reject the plan. Chapter 11 does not require

4 all holders of claims and interests to vote in favor of a plan in order for the Bankruptcy Court

5 to confirm it. However, the Bankruptcy Court must find that the plan meets a number of

6 statutory tests before it may approve the plan. These tests are designed to protect the

7 interests of holders of claims or interests who do not vote to accept the plan, but who will

8 nonetheless be bound by the plan's provisions if it is confirmed by the Bankruptcy Court.

9        An official committee of unsecured creditors is appointed by the trustee in

10 most Chapter 11 cases to, among other things, negotiate the plan of reorganization on behalf

11 of the unsecured creditors of the debtor. A committee of unsecured creditors (the

12 "Unsecured Creditors' Committee") was appointed by the United States Trustee in this case,

13 and the committee is represented by attorney Marc Barreca of K&L Gates LLP, Seattle,

14 Washington.

15        **C.     PLAN SUMMARY**

16        Below is a general summary of the Plan. A copy of the Plan is attached hereto

17 as Exhibit 1 and the Plan is discussed in more detail in Section VI of this Disclosure

18 Statement. Statements in this Disclosure Statement describing or summarizing the Plan are

19 qualified in their entirety by reference to the Plan. Each holder of a Claim should carefully

20 review the entire Plan, together with this Disclosure Statement, before voting on the Plan.

21        1.     <u>General</u>. The Plan contemplates that Debtor will continue to operate

22 in the ordinary course and pay and satisfy its obligations under the Plan from revenue

23 generated by continuing operations. Debtor believes it will be able to operate profitably and

24 its value as going concern will be enhanced by continued operation following confirmation

25 of the Plan.

26

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1       2.     B of A's Secured Claim. Debtor has only one secured creditor, Bank

2 of America, N.A. ("B of A"). As of the Petition Date, Debtor owed B of A approximately

3 $15,564,161. B of A has a first priority security interest in all of Debtor's personal property,

4 including that certain $7,000,000 promissory note dated October 1, 2008 from Downtown

5 Vitality Partners LLC ("DVP") to Debtor (the "DVP Note"). B of A also has a first and only

6 deed of trust on Debtor's real property located at 701 W. 8th Street, Vancouver, Washington.

7 B of A does not have a security interest in Debtor's real property located at 615 W. 6th Street,

8 Vancouver, Washington (referred to herein as the "Petlock Property"), with an approximate

9 value of $2,000,000 (based on February 10, 2009 appraisal) or in Debtor's real property

10 located at 425 NE 4th Avenue, Camas, Washington (approximate value of $400,000 based on

11 May 8, 2009 appraisal). B of A's Collateral is discussed in more detail in Section V.C.1.

12 below.

13       The Plan provides that B of A's Secured Claim will be Allowed in the amount

14 of $9,000,000 and will be satisfied by delivery of a $9,000,000 promissory note to B of A

15 payable by Reorganized Debtor (the "B of A Note"). The B of A Note will accrue interest at

16 the rate of 5.25% per annum and will be paid in equal quarterly installments of principal and

17 interest based on a 30-year amortization schedule, with a balloon payment due 10 years after

18 the Effective Date. As security for the B of A Note, B of A will retain its security interest in

19 the Collateral securing its Secured Claim with the same priority that such security interest

20 had on the Petition Date.

21       B of A will retain a General Unsecured Claim in the amount of $6,500,000.

22       3.     Unsecured Claims. The Plan provides that Unsecured Claims will be

23 divided into four Classes: Subscriber Refund Claims, Small Unsecured Claims,

24 Subordinated Unsecured Claims and General Unsecured Claims.

25       Holders of Allowed Subscriber Refund Claims will be paid the full amount of

26 their Subscriber Refund Claims within 30 days after the Effective Date.

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1         Holders of Allowed Small Unsecured Claims (Unsecured Claims of $5,000 or

2  less) will be paid an amount equal to 60% of their Small Unsecured Claims within 30 days

3  following the Effective Date.

4         Holders of Subordinated Unsecured Claims will not be paid anything on

5  account of their Subordinated Unsecured Claims.

6         Holders of Allowed General Unsecured Claims will be paid Pro Rata from a

7  Creditors' Trust established for the purpose of paying Allowed General Unsecured Claims.

8  The Creditors' Trust is discussed in Section VI.B.3.e. of this Disclosure Statement.

9         4.   <u>Equity Interests</u>.  The Plan provides that all Interests in Debtor will be

10  cancelled as of the Effective Date.  Interest holders will receive nothing on account of their

11  common stock of Debtor.  On the Effective Date, Reorganized Debtor will issue 500,000

12  shares of common stock to Scott Campbell (and/or a Campbell family trust and/or an

13  immediate family member of Scott Campbell) in exchange for $500,000 Cash to be paid by

14  Scott Campbell to Reorganized Debtor on or before the Effective Date.  In addition to the

15  shares to be issued to Scott Campbell (and/or a Campbell family trust and/or an immediate

16  family member of Scott Campbell), the Plan provides that on the Effective Date any Creditor

17  may purchase common stock in Reorganized Debtor in blocks of not less than 50,000 shares

18  for $1 per share provided that such Creditor has executed and delivered to Debtor a signed

19  subscription agreement on or before the Confirmation Date.

20         5.   <u>Leases and Executory Contracts</u>.  The Plan provides that all of

21  Debtor's executory contracts and unexpired leases will be deemed rejected by operation of

22  law on the Effective Date, except for any executory contract or unexpired lease that has been

23  specifically assumed or rejected by Debtor on or before the Effective Date or in respect of

24  which a motion for assumption or rejection has been Filed by Debtor on or before the

25  Effective Date.

26

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

6. **Effective Date.** The Effective Date of the Plan will be the later of 11:59 p.m. on January 31, 2010, or the first day after the Confirmation Order shall have become a Final Order.

In the event any impaired Class does not accept the Plan, Debtor reserves the right to request that the Bankruptcy Court confirm the Plan in accordance with Section 1129(b) of the Bankruptcy Code or otherwise modify the Plan.

## II.  VOTING PROCEDURES AND CONFIRMATION OF A PLAN

### A.  BALLOTS AND VOTING DEADLINE

A ballot to be used for voting to accept or reject the Plan is enclosed with each copy of this Disclosure Statement mailed to all Creditors entitled to vote. After carefully reviewing this Disclosure Statement and its exhibits, including the Plan, please indicate your acceptance or rejection of the Plan by voting in favor or against the Plan on the enclosed ballot as directed below.

The Bankruptcy Court has directed that, to be counted for voting purposes, ballots for the acceptance or rejection of the Plan must be received no later than _____ __.m. Pacific Time, on _____, __, 2009 by Debtor at the following address:

> Tonkon Torp LLP
> Attention:  Michael W. Fletcher
> 1600 Pioneer Tower
> 888 SW Fifth Avenue
> Portland, Oregon 97204-2099

or via facsimile transmission to Michael W. Fletcher at (503) 972-3869.

Holders of each Claim scheduled by Debtor or with respect to which a Proof of Claim has been filed will receive ballots and are permitted to vote based on the amount of the Proof of Claim. If no Proof of Claim has been filed, then the vote will be based on the amount scheduled by Debtor in its Schedules. Holders of disputed Claims who have settled their dispute with Debtor are entitled to vote the settled amount of their Claim. The Bankruptcy Code provides that such votes will be counted unless the Claim has been

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1 disputed, disallowed, disqualified or suspended prior to computation of the vote on the Plan.

2 The Claim to which an objection has been filed is not allowed to vote unless and until the

3 Bankruptcy Court rules on the objection. The Bankruptcy Code provides that the Bankruptcy

4 Court may, if requested to do so by the holder of such claim, estimate or temporarily allow a

5 disputed claim for the purposes of voting on the Plan.

6        If a person holds Claims in more than one Class entitled to vote on the Plan,

7 such person will be entitled to complete and return a ballot for each Class. If you do not

8 receive a ballot or if a ballot is damaged or lost, please contact:

9          Tonkon Torp LLP
         Attention: Leslie Hurd
10          1600 Pioneer Tower
         888 SW Fifth Avenue
11          Portland, Oregon 97204-2099
         Telephone Number: (503) 802-2082

12

13        All persons entitled to vote on the Plan may cast their vote for or against the

14 Plan by completing, dating and signing the ballot accompanying this Disclosure Statement

15 and returning it, by first class mail or hand delivery, to Debtor at the address indicated above.

16 In order to be counted, all ballots must be executed and <u>received</u> at the above address no later

17 than _____ __.m. Pacific Time on _____, ___, 2009. Any ballots received after

18 _____ __.m. Pacific Time on _____, ____, 2009 will not be included in any

19 calculation to determine whether the parties entitled to vote on the Plan have voted to accept

20 or reject the Plan.

21        Ballots may be received by Debtor by facsimile transmission to Tonkon Torp

22 LLP, Attention: Michael W. Fletcher at (503) 972-3869. Ballots sent by facsimile

23 transmission will be counted if faxed to Mr. Fletcher by _____ __.m. Pacific Time on

24 _____, ___, 2009.

25        When a ballot is signed and returned without further instruction regarding

26 acceptance or rejection of the Plan, the signed ballot shall be counted as a vote accepting the

**Page 8 of 50**  DEBTOR'S ~~FIRST~~SECOND AMENDED DISCLOSURE
STATEMENT (~~NOVEMBER~~DECEMBER 1~~3~~, 2009) - 8 of 50
In re The Columbia Publishing Company, Case No. 09-43133-PBS

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1   Plan.  When a ballot is returned indicating acceptance or rejection of the Plan but is unsigned,

2   the unsigned ballot will not be included in any calculation to determine whether parties

3   entitled to vote on the Plan have voted to accept or reject the Plan.  When a ballot is returned

4   without indicating the amount of the Claim, the amount shall be as set forth on Debtor's

5   Schedules or any Proof of Claim filed with respect to such Claim.

6       **B.    PARTIES ENTITLED TO VOTE**

7               Pursuant to Section 1126 of the Bankruptcy Code, any holder of an Allowed

8   Claim that is in an impaired Class under the Plan, and whose Class is not deemed to reject

9   the Plan, is entitled to vote.  A Class is "impaired" unless the legal, equitable and contractual

10  rights of the holders of claims in that Class are left unaltered by the Plan or if the Plan

11  reinstates the Claims held by members of such Class by (1) curing any defaults, (2)

12  reinstating the maturity of such claim, (3) compensating the holder of such claim for

13  damages that result from the reasonable reliance on any contractual provision of law that

14  allows acceleration of such claim, and (4) otherwise leaving unaltered any legal, equitable or

15  contractual right of which the Claim entitles the holder of such claim.  Because of their

16  favorable treatment, Classes that are not impaired are conclusively presumed to accept the

17  Plan.  Accordingly, it is not necessary to solicit votes from the holders of Claims in Classes

18  that are not impaired.  Class 1 (Other Priority Claims) and Class 3 (Subscriber Refund

19  Claims) are not impaired and therefore are deemed to have accepted the Plan.

20              Classes of Claims or Interests that will not receive or retain any money or

21  property under a Plan on account of such Claims or Interests are deemed, as a matter of law

22  under Section 1126(g) of the Bankruptcy Code, to have rejected the Plan and are likewise not

23  entitled to vote on the Plan.  Accordingly, Class 6 (Subordinated Unsecured Claims) and

24  Class 7 (Interests) are deemed to have rejected the Plan.

25              All other Classes of Claims are impaired under the Plan, and accordingly

26  holders of Allowed Claims in Class 2 (B of A's Secured Claim), Class 4 (Small Unsecured

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

Claims) and Class 5 (General Unsecured Claims) are entitled to vote to accept or reject the Plan.

### C. VOTES REQUIRED FOR CLASS ACCEPTANCE OF THE PLAN

As a condition to confirmation, the Bankruptcy Code requires that each impaired Class of Claims or Interests accept the Plan, subject to the exceptions described below in the section entitled "'Cram Down' of the Plan." At least one impaired Class of Claims must accept the Plan in order for the Plan to be confirmed.

For a Class of Claims to accept the Plan, Section 1126 of the Bankruptcy Code requires acceptance by Creditors that hold at least two-thirds in dollar amount and a majority in number of the Allowed Claims of such Class, in both cases counting only those Claims actually voting to accept or reject the Plan. The holders of Claims who fail to vote are not counted as either accepting or rejecting the Plan. If the Plan is confirmed, the Plan will be binding with respect to all holders of Claims and Interest in each Class, including Classes and members of Classes that did not vote or that voted to reject the Plan.

### D. "CRAM DOWN" OF THE PLAN

If the Plan is not accepted by all of the impaired Classes of Claims, the Plan may still be confirmed by the Bankruptcy Court pursuant to Section 1129(b) of the Bankruptcy Code's "Cram Down" provision if the Plan has been accepted by at least one impaired Class of Claims, without counting the acceptances of any insiders of Debtor, and the Bankruptcy Court determines, among other things, that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each non-accepting impaired Class of Claims or Interest. Debtor believes the Plan can be confirmed even if it is not accepted by all impaired Classes of Claims.

### E. CONFIRMATION HEARING

The Bankruptcy Court has scheduled a hearing on confirmation of the Plan to take place on ~~_____~~ January 13, 20~~10~~09, at ~~_____ __~~9:00 a.m. Pacific

**Page 10 of 50** ~~_____~~ DEBTOR'S ~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT (~~NOVEMBER~~DECEMBER 1~~3~~, 2009) - 10 of 50
In re The Columbia Publishing Company, Case No. 09-43133-PBS

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1   Time.  The confirmation hearing will be held at the United States Bankruptcy Court for the

2   Western District of Washington, ~~_____~~ 1717 Pacific

3   Avenue, Tacoma, Washington 98402, before the Honorable Paul B. Snyder, United States

4   Bankruptcy Judge.  At the hearing, the Bankruptcy Court will consider whether the Plan

5   satisfies the various requirements of the Bankruptcy Code, including whether it is feasible

6   and whether it is in the best interest of the Creditors.  At that time, Debtor will submit a

7   report to the Bankruptcy Court concerning the votes for acceptance or rejection of the Plan

8   by the persons entitled to vote thereon.

9           Section 1128(b) of the Bankruptcy Code provides that any party in interest

10   may object to confirmation of the Plan.  Any objections to confirmation of the Plan must be

11   made in writing and filed with the Bankruptcy Court and received by counsel for Debtors no

12   later than _____ ____, 2009, by _____ __.m. Pacific Time.  Unless an objection to

13   confirmation is timely filed and received, it may not be considered by the Bankruptcy Court.

14   **III.    BACKGROUND AND GENERAL INFORMATION**

15          **A.    THE COLUMBIAN**

16          In 1918, a respected Portland Oregon newspaperman by the name of Herbert

17   Campbell invented a gimmick to fill text gaps on newspaper pages with interesting bits of

18   information.  The idea was a big success, and he was able to syndicate the service to

19   hundreds of newspapers nationally, giving him the capital to pursue his dream – owning a

20   community newspaper and raising his family in a vibrant growing community.  In 1921,

21   Herbert Campbell bought The Columbian, which had been published since 1890.

22          Herbert Campbell made many improvements to the newspaper, including the

23   addition of wire photographs and automated typesetting.  In later years, after Herbert's

24   untimely death, Herbert's sons Don and then Jack Campbell took the reins of the family

25   business:  Don handling the business affairs and Jack serving as the paper's editor.  This was

26   an extremely successful partnership, lasting through the 1960's and into the early 1970's.

**Page 11 of 50** ~~—————~~DEBTOR'S ~~FIRST~~SECOND AMENDED DISCLOSURE
STATEMENT (~~NOVEMBER~~DECEMBER 1~~3~~, 2009) - 11 of 50
In re The Columbia Publishing Company, Case No. 09-43133-PBS

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

Case 09-43133-PBS   Doc 182-1   Filed 12/01/09   Entered 12/01/09 16:34:14   Page 11 of 50

1    During that time, the business built on its reputation as an important news organization in the

2    region, installed a state-of-the-art offset printing press, and grew a commercial printing

3    business.

4            In the mid-1960's and 1970's, Don's son Scott Campbell (the current President

5    and Publisher of The Columbian) worked in almost all the departments of the newspaper,

6    from mopping out glue vats on the graveyard shift to interning as a staff photographer on

7    summer vacation.  Scott's passion for the business was sparked and, after earning a

8    journalism degree from the University of Oregon, he joined The Columbian full time in 1979

9    in the circulation department.  Eventually he became the manager of that department, and

10   began to co-manage some of The Columbian's larger administrative functions with his father.

11           Scott took the reins as the Publisher and President of The Columbian in 1987

12   at the age of 31.  At the time Scott was the youngest publisher of a daily newspaper in the

13   United States.  Scott led The Columbian through a decade of refocusing the strategy of The

14   Columbian away from the declining commercial printing business, reinforcing the core

15   business, and embarking on a successful profitability improvement program.  This entailed

16   making tough choices on improving performance accountability, reducing staffing levels, and

17   investing in new business initiatives like the electronic delivery of information.

18           Scott also built on his family's notion that a newspaper must be thoroughly

19   embedded in efforts to improve the overall vitality of the community, and he began to push

20   for several important community initiatives, including revitalizing the Vancouver waterfront,

21   establishing an economic development effort, and siting a major university presence in the

22   community.  The Columbian advocated for these initiatives on its editorial pages on a regular

23   basis, covered these issues extensively in its news columns, and Scott served in a leadership

24   role in working to bring these efforts, and many other community improvement efforts, to

25   fruition.

26

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1    The Columbian's dedication to its community is one of the factors that

2  separates The Columbian from its chain-owned counterparts. The Columbian is one of only

3  200 independent daily newspapers among the 1800 daily newspapers in the United States.

4    The bond between the community and The Columbian is evident in the many

5  long time subscribers who have been with the paper for decades, as well as in the positive

6  feedback from newcomers to the area who have the ability to compare The Columbian's

7  journalism with newspapers in other communities.

8    In 2006, The Columbian was awarded the first ever general-excellence award

9  in a six state region by the Society of Professional Journalists.

10    **B.**    **THE COLUMBIAN AND CLARK COUNTY**

11    Clark County, and particularly Vancouver, Washington, is a vibrant and

12  growing community.  Its retail base has increased dramatically over the last 10 years.  New

13  store locations in Vancouver include Kohl's, Best Buy, Cost Plus World Market, Fred

14  Meyer, Lowes, JC Penney and Costco.

15    Clark County is frequently cited as one of the fastest growing counties in the

16  state of Washington. Vancouver, the largest city in Clark County, has maintained an identity

17  separate from the Portland, Oregon metropolitan area, which lies directly across the

18  Columbia River from Vancouver.

19    Clark County is served by two daily newspapers – The Columbian and The

20  Oregonian.  The Columbian dominates the Clark County market, with a readership level

21  approaching 62% of adults reading the paper in an average week.  The Oregonian, which has

22  refocused its coverage on the Portland Oregon market, contains little Clark County news and

23  has closed its Clark County news bureau.  The Oregonian's circulation is one-third the

24  number of customers as The Columbian in Clark County.

25    The rural Clark County areas are served by two weekly newspapers:  The

26  Battleground Reflector and the Camas-Washougal Post-Record.  The Columbian owns and

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1  operates the Camas-Washougal Post-Record and has merged operational components with

2  The Columbian, which has helped the Camas-Washougal Post-Record to be modestly

3  profitable.

4  　　　　The Clark County community is hungry for local news and information, and

5  The Columbian fills an important void in the media landscape for Clark County.  The

6  Columbian is the only media that effectively allows for the exclusive targeting of Clark

7  County consumers.  The Columbian is unique in serving the local news needs of Clark

8  County advertisers and residents.  No other news organization offers Clark County residents

9  the comprehensive coverage of local politics, sports, entertainment, business and general

10  local news – as well as local advertising - as its central purpose.  Because of its proximity to

11  the Oregon border, Vancouver is unusual in not having locally based television or radio

12  stations.  This means The Columbian is an even more important provider of news in the

13  Clark County market and an even more viable media business.

14  　　**C.**　　**MANAGEMENT TEAM/BOARD OF DIRECTORS**

15  　　　　<u>Management Team</u>.  The Columbian's management team is set forth below.

16  The Columbian anticipates that each member of its management team will continue with The

17  Columbian post-confirmation.

18  　　　　<u>Scott C. Campbell, President and Publisher</u> (1987 to Present).  Mr. Campbell

19  is a third generation owner of The Columbian, and grew up in the business, working on the

20  floor of the production departments doing manual labor and working through most of the

21  major functions of The Columbian.  In August, 1987, Mr. Campbell became The

22  Columbian's President and Publisher at the age of 31.  Prior to becoming President and

23  Publisher, Mr. Campbell served as President and Chief Operating Officer (1986-1988) and as

24  Circulation Director (1980-1986).  Mr. Campbell held internships at The Washington Post,

25  The Trenton (NJ) Times and the Sacramento Union (1978 and 1979).  He earned his B.S.

26  degree from the University of Oregon School of Journalism in 1979.

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1    Mr. Campbell has led The Columbian through a conversion to a morning

2    delivery, established a seven-day-a-week publishing cycle, and developed one of the first

3    newspaper internet development programs.

4    Mr. Campbell is active in the community, has served on community

5    development and service organization boards for almost 30 years, and helped start the local

6    Clark County economic development council.

7    <u>Douglas E. Ness, CFO and Corporate Treasurer</u> (1985 to Present)  Mr. Ness

8    joined The Columbian in 1985 as the Chief Financial Officer.  His responsibilities include

9    accounting and financial reporting, purchasing, information technology and building

10   management.  He also serves on The Columbian's Board of Directors.  Prior to joining The

11   Columbian, Mr. Ness held several positions in the computer and management consulting

12   fields, including six years with Arthur Andersen & Co.  He majored in accounting and

13   received his B.A. degree in Business from Washington State University in 1969.

14   <u>Marc Dailey, Circulation Director</u> (1988 to Present)  Since joining The

15   Columbian in 1988 as Circulation Director, Mr. Dailey has successfully led the Circulation

16   Division through several major changes, including the addition of a Saturday edition and the

17   conversion to a morning delivery cycle.  Mr. Dailey's 51 years of newspaper experience

18   includes:  Wenatchee World (1958-1988) (Circulation Director - 1977-1988; Assistant

19   Circulation Director – 1972-1977; District Manager – 1967-1972; Apprentice Printer – 1965-

20   1968; Circulation Night Complaint Clerk – 1963-1965; Mailer – 1960-1963; and Carrier –

21   1958-1960).

22   <u>Lou Brancaccio, Editor/News Director</u> (1997 to Present)  Mr. Brancaccio is

23   responsible for The Columbian's news division.  Mr. Brancaccio joined The Columbian in

24   1997 as Managing Editor and was promoted to Editor in 2001.  His 34 years of news

25   experience includes:  Managing Editor of The Outlook, Santa Monica, California (1994-

26   1997); Executive Editor of The Press & Sun-Bulletin, Binghamton, New York (1989-1994);

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1  USA Today six-month special news project (1987); and various news positions ending as

2  Managing Editor at The News-Press in Fort Myers, Florida (1975-1989). Mr. Brancaccio

3  earned his B.S. degree in Journalism from the University of Florida in 1975.

4  <u>Jeffrey Stalcup, Production Director</u> (2003 to Present) Mr. Stalcup is

5  responsible for all aspects of the production division. His experience includes: Assistant

6  Operations Manager of the King County Journal (2001-2003); Assistant Press Manager –

7  Operations of The Seattle Times (2000-2001); Night Packaging Manager – Operations

8  (1997-2000); Operations Manager of the Peninsula Daily News (1995-1997); and Production

9  Coordinator of USA Today (1993-1995). Mr. Stalcup received his BA in Business

10  Administration from Western Washington University in 1992, and his Master of Business

11  Administration from Seattle University in 2003.

12  <u>Teresa Keplinger, Advertising Director</u> (2006 to Present) Ms. Keplinger is

13  responsible for advertising revenue generation through existing and new products. Her

14  experience includes: Advertising Director at the Statesman Journal in Salem, Oregon (2000-

15  2006); and various advertising positions ending as Advertising Director of the Mail Tribune

16  in Medford, Oregon (1977-2000).

17  **D.    EVENTS LEADING TO CHAPTER 11 FILING**

18  **1.    DECLINE IN ADVERTISING AND READERSHIP DUE TO A
          DECLINING U.S. ECONOMY AND STRUCTURAL CHANGES
19         IN THE NEWSPAPER INDUSTRY**

20  The Columbian's revenues come roughly 80% from advertisers and 20% from

21  subscribers. Both these revenue sources have decreased in the past few years, and

22  particularly in the last 18 months, due to the declining economy and structural changes in the

23  newspaper industry.

24  <u>Advertising Revenues</u>. The Columbian's advertising revenues have declined,

25  particularly in the last 18 months, as a result of structural changes and the declining United

26  States economy.

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1   Structural changes and a shift in media consumption habits have evolved

2 considerably over the last 50 years or more.  With the invention of radio, television, cable,

3 satellite TV, and the internet, newspaper companies have evolved to redefine their financial

4 structures and customer offerings.  Recently, newspaper companies have lost significant

5 amounts of classified advertising to online competitors like Craigslist and eBay.

6   In the past, advertising has contributed an average of 80% to 85% of total

7 revenues for newspaper companies.  Recently, as a result of the poor economy, advertising

8 on all platforms has declined at historic rates.  Retailers, automotive advertisers, help wanted

9 advertisers and real-estate advertisers – typically the mainstay of newspaper advertisers -

10 have dramatically pulled back on their advertising programs.

11   In the future, The Columbian expects an improving economy to help the

12 general volume of business in all those segments, but not rising to past levels due to

13 structural changes.

14   <u>Readers/Print and Online</u>.  The Columbian is published mornings seven days a

15 week, with an average paid circulation of 40,000 daily and 45,000 on Sunday.  Debtor began

16 publishing the Saturday edition of The Columbian in 1999 and converted from an afternoon

17 to a morning publication in 2000.

18   Print circulation for the newspaper industry and for The Columbian has been

19 in a modest decline over the past few years as consumers have more access to an ever

20 increasing array of information sources, many of them free, including Debtor's own

21 "Columbian.com."  Debtor's budgeting assumptions do not assume a change in this dynamic.

22   Print readership habits are also evolving, with a portion of the loyal print

23 audience moving from a strict seven day per week readership habit to a less frequent four to

24 five issues per week readership.  This trend has a negative impact on the average daily paid

25 circulation numbers, but less so on total weekly audience numbers.

26

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1    To combat the print circulation decline, The Columbian is a vigorous

2  participant in the emerging new media landscape.  Columbian.com was one of the early

3  newspaper web sites – established in 1994. It has been constantly evolving and growing.

4  Traffic to the site has surpassed many information outlets locally, becoming the second most

5  popular news destination in Clark County – second only to The Columbian print edition.

6  Online viewership is on a constant growth curve, and has grown to 38,000 visitors averaging

7  four visits per week.  Online revenues were approaching the million dollar mark for 2008,

8  and have the potential for significant additional growth, especially after the recession abates.

9    The Columbian also publishes an E-edition, an electronic replica of the print

10  newspaper to more than 500 customers daily, as well as a business newsletter reaching more

11  than 5000 readers daily.

12    **2.    CONSTRUCTION AND LEASE OF THE DVP BUILDING**

13    In January 2008, The Columbian moved out of its headquarters facility

14  located at 701 W. 8th Street, Vancouver, Washington and into a newly constructed building

15  owned by Downtown Vitality Partners LLC ("DVP") located at 415 W. 6th Street,

16  Vancouver, Washington (the "DVP Building").  The DVP Building was designed and built

17  specifically for The Columbian as the master tenant, and The Columbian entered into a long

18  term master lease with DVP for the DVP Building.  In connection with the construction of

19  the DVP Building, The Columbian loaned DVP over $11,000,000, repayable pursuant to a

20  revolving loan agreement entered into between DVP and The Columbian.

21    Unfortunately, shortly after moving into the DVP building the recession began

22  to significantly impact The Columbian's revenues.  The Columbian quickly reacted and

23  implemented numerous cost reduction initiatives (including staff layoffs).  On October 1,

24  2008, The Columbian terminated its master lease with DVP pursuant to a lease termination

25  and settlement agreement, and shortly thereafter moved back to its previous headquarters

26  facility.  The lease termination resulted in The Columbian becoming obligated to DVP for

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1  lease termination damages, which DVP and The Columbian settled for $2,560,066. That

2  amount was set off against DVP's obligations to The Columbian, leaving $7,000,000 owing

3  by DVP to The Columbian (evidenced by the DVP Note referred to previously in this

4  Disclosure Statement). To date, DVP has not made any payments on the DVP Note.

5          <u>Bank of America Litigation</u>. In 2006 and 2007, The Columbian entered into

6  various loan documents with B of A pursuant to which The Columbian borrowed

7  $14,500,000 from B of A. The loans are secured by a security interest in all personal

8  property of The Columbian, as well as by a deed of trust on The Columbian's real property

9  located at 701 W. 8th Street, Vancouver, Washington (The Columbian's current headquarters

10 facility). The loans matured on October 1, 2008 and The Columbian could not repay the

11 loans on the maturity date.

12         The Columbian attempted to reach a resolution with B of A, but negotiation

13 efforts with B of A were not successful. On April 8, 2009, B of A filed a lawsuit against The

14 Columbian in the Superior Court of the State of Washington, Clark County. In the lawsuit,

15 B of A sought to obtain a judgment against The Columbian for all principal, interest and fees

16 due under the loan documents, and sought authority to foreclose on its personal property

17 security interest and its deed of trust.

18         Accordingly, to ensure its long term success and survival, The Columbian was

19 forced to seek the protections of a Chapter 11 bankruptcy and filed for Chapter 11 protection

20 on May 1, 2009.

21     **E.**    **THE COLUMBIAN'S BUSINESS PLAN**

22         The Columbian has realized for some time that even as the economy recovers

23 it would not return to past revenue levels because of the structural changes outlined above.

24 As discussed in more detail below, The Columbian has already adjusted its expenses and cost

25 structure to meet this new "normal" level of revenues, is beginning to cultivate its online

26 business to capture additional revenue, and continues to seek out additional revenue sources.

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

The Columbian is confident that as a result of its cost-cutting measures it can successfully emerge from Chapter 11 and operate profitability now and into the future.

The Columbian has been through a massive restructuring of it operations over the last 18 months, including three rounds of staff reductions, moving out of the newly constructed DVP Building, and instituting process improvements and cost reduction initiatives in all areas of The Columbian. In the past few years The Columbian has also invested in capital expenditures that should save The Columbian over a half-million dollars in annual costs. These proactive actions have substantially decreased The Columbian's cost of operations, and should keep The Columbian operationally profitable even in this severely impaired economy. The restructuring of costs in The Columbian has been taken to permanently reposition its cost structure, and match developing changes in the revenue model for the future, particularly with regard to classified advertising.

In addition to cutting costs, The Columbian is diligently working to tap new online revenue streams. Columbian.com has had rapid audience growth over the past few years. The Columbian recently invested in a new Saxotech content management system coupled to a powerful web publishing platform that will provide the technical structure for future development. Additionally, The Columbian anticipates it will soon participate in new partnerships for online behavioral-targeted advertising that will expand The Columbian's revenue base. An example is The Columbian's partnering with "Yahoo!" in selling online employment advertising and eventually behaviorally-targeted advertising to web users.

From a strategy standpoint on new product development, The Columbian has determined that it does not need to "pioneer" expensive and risky new product initiatives. Instead, The Columbian's strategy is to be sharp "scouts" on emerging ideas and stay sharply tuned to developing and successful initiatives in the industry. The Columbian strives to be early adopters of successful marketing initiatives.

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1    The Columbian has also recently implemented a new means of delivering

2    subscriptions through a computer based system that supplements the print edition delivery by

3    providing a full copy of the print edition in a paperless delivery channel, known as the

4    "e-edition." This represents a growing sector of The Columbian's circulation sales efforts.

5    The Columbian's advertising staff has been developing relationships with

6    businesses as they have fought their way through this tough recession, looking for additional

7    options that reflect the realities of tight economics. Lower cost products have been

8    developed that allow additional exposure and more economical advertising and marketing.

9    An example is the reformatting of The Columbian's real estate "Home Book" publication.

10   Previously a high gloss product that required a more expensive production process and a

11   third party printer, the new-concept product is back to traditional newsprint, in a larger size,

12   and a lower price point. Customer response to this reformatting is extremely positive, and is

13   resulting in significant recovery of advertising dollars.

14   In a changing media landscape – especially now – predicting the future is

15   risky. But The Columbian believes print will continue to play an important role in serving

16   the news and information needs of Clark County for the foreseeable future. Print content will

17   likely evolve to emphasize The Columbian's core business – providing local news and

18   information.

19   The Columbian has a long and successful history serving the news and

20   information needs in Clark County, and particularly the greater Vancouver, Washington

21   market. The Greater Vancouver, Washington area depends on The Columbian for local news

22   reporting and advertising. The Columbian is one of the important cornerstones in supporting

23   the local identity of the community, which is vastly under-served by other news outlets.

24   The owners, managers and employees of The Columbian are committed to the

25   long-term success of The Columbian. Substantial changes instituted in the last 18 months,

26

**Page 21 of 50** ——DEBTOR'S ~~FIRST~~SECOND AMENDED DISCLOSURE
STATEMENT (~~NOVEMBER~~DECEMBER 1~~3~~, 2009) - 21 of 50
In re The Columbia Publishing Company, Case No. 09-43133-PBS

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

Case 09-43133-PBS   Doc 182-1   Filed 12/01/09   Entered 12/01/09 16:34:14   Page 21 of 50

combined with future product changes, will provide a new base for The Columbian's success well into the future.

### F.   HISTORICAL FINANCIAL STATEMENTS

Exhibit 2 (comparative income statements) and Exhibit 3 (comparative balance sheets) attached hereto contain, in summary fashion, historical financial information for Debtor.

### G.   FINANCIAL PROJECTIONS

Exhibit 4 attached hereto presents in summary fashion Debtor's projected income statements and projected cash flow statements, each through five years after the Effective Date.

## IV.   POST-PETITION DEVELOPMENTS

### A.   FIRST-DAY ORDERS

At the beginning of Debtor's Chapter 11 case, the Bankruptcy Court entered a number of "first day" orders that Debtor requested for purposes of maintaining ongoing business operations and to insure that the Chapter 11 filing would not disrupt Debtor's operations.  These orders, among other things, authorized Debtor to pay employees their accrued prepetition wages, salaries, compensation, expenses, benefits and related taxes; to maintain Debtor's prepetition bank accounts; to continue Debtor's existing utility services, including determining an adequate amount of utility deposits; and to continue to honor prepaid subscriptions.

### B.   USE OF CASH COLLATERAL

Following the filing of Debtor's Chapter 11 case, Debtor has operated on its cash flow pursuant to a series of cash collateral orders agreed to by The Columbian and B of A, and entered by the Bankruptcy Court.

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

### C. EMPLOYMENT OF PROFESSIONALS

Since the Petition Date, the Court has entered Orders in this case authorizing Debtor to retain Tonkon Torp LLP as Debtor's general bankruptcy counsel, Miller Nash LLP as Debtor's Special Counsel, Davis, Wright, Tremaine LLP as Debtor's Special Counsel, The Mountain Group as consultants for Debtor, and Moss Adams LLP as Debtor's accountants.

### D. UNSECURED CREDITORS COMMITTEE

On May 15, 2009, a committee of unsecured creditors (the "Unsecured Creditors' Committee) was appointed by the United States Trustee in this case, consisting of the following creditors

Linda Fornero, Chairperson
Business Credit Manager
North Pacific Paper Corp.
c/o Weyerhaeuser NR Company
PO Box 9777
Federal Way, WA 98063

Matthew Todd, Secretary
B&B/Entek Air Conditioning
7316 NE 47th Ave
Vancouver, Washington 98661

John Pukas
Vice President Business Relations
Saxotech
302 Knights Run Ave., #1150
Tampa, FL 33602

The Unsecured Creditors' Committee has retained Marc Barreca and the firm of K&L Gates LLP as its legal counsel.

### E. B OF A'S MOTION FOR RELIEF FROM STAY

In addition to having outstanding loans to The Columbian, B of A has outstanding loans to DVP totaling approximately $27.2 million. DVP has defaulted on its obligations to B of A. DVP's obligations to B of A are secured by, among other things, a first deed of trust on the DVP Building. The Columbian has a second deed of trust on the DVP Building. B of A filed a motion for limited relief from stay, seeking authority to publish and serve the required statutory notice of trustee's sale and thereafter proceed with its pending non-judicial foreclosure of its first deed of trust on the DVP Building. Both The

**Page 23 of 50** ——— DEBTOR'S ~~FIRST~~ SECOND AMENDED DISCLOSURE STATEMENT (~~NOVEMBER~~ DECEMBER 1~~3~~, 2009) - 23 of 50
In re The Columbia Publishing Company, Case No. 09-43133-PBS

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1   Columbian and the Unsecured Creditors' Committee in this Case filed objections to B of A's

2   motion.  On September 4, 2009, the Court held an evidentiary hearing on the motion.

3   Evidence was presented at the hearing regarding the value of the DVP Building, and the DVP

4   Note and second deed of trust.  Evidence was also presented regarding the current sale and

5   leasing prospects for the DVP Building.  Upon conclusion of the evidence, the Court

6   continued the hearing until November 3, 2009.  At the November 3rd hearing, the Court

7   indicated that it would grant B of A's motion effective as of December 1, 2009.

8        **F.**     **503(b)(9) MOTION**

9          The Columbian filed a motion with the Court seeking authority to

10   immediately pay certain undisputed "503(b)(9) Claims" in an aggregate amount not to exceed

11   $190,000.  In general, a 503(b)(9) Claim is a Claim accorded administrative expense priority

12   for the value of any goods sold to The Columbian in the ordinary course of business that

13   were received by The Columbian within 20 days prior to the Petition Date.  A condition to

14   immediate payment of any 503(b)(9) Claim would be that the supplier that holds the Claim

15   agrees in writing with The Columbian to continue supplying goods to The Columbian on

16   trade terms that existed prior to the Petition Date.

17          No hearing has yet been held on the Motion.

18   **V.**     **ASSETS AND LIABILITIES**

19          Exhibit 3 attached hereto presents in summary fashion Debtor's balance sheet

20   as of December 31, 2006, December 31, 2007, December 31, 2008, the Petition Date, and

21   June 30, 2009.

22        **A.**     **ASSETS**

23          As set forth in Exhibit 3, Debtor's assets consist primarily of cash, equipment,

24   inventory, real estate and the DVP Note.  All of Debtor's assets, other than Debtor's real

25   property located at 615 W. 6th Street, Vancouver, Washington (approximate value of

26   $2,000,000 based on February 10, 2009 appraisal) and Debtor's real property located at 425

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1  NE 4th Avenue, Camas, ~~WA~~Washington (approximate value of $400,000 based on May 8,

2  2009 appraisal), are subject to a security interest in favor of B of A.  Thus, the value of

3  Debtor's unencumbered assets is approximately $2,400,000.

4      **B.**    **AVOIDANCE ACTIONS**

5            Avoidance Actions ~~under Chapter 5 of the Bankruptcy Code~~, including,

6  without limitation, preference and fraudulent transfer actions, are assets of the Debtor's

7  bankruptcy estate.  Preference actions may, with certain exceptions, be used to recover

8  payments made to creditors within the 90 days immediately preceding the Debtor's

9  bankruptcy filing, or within one year if the payments were to an insider.  Fraudulent transfer

10  actions may, with certain exceptions, be used to recover property transferred by the Debtor

11  with actual intent to hinder, delay, or defraud creditors, or if the Debtor received less than

12  reasonably equivalent value for the transfer, and the Debtor was insolvent or rendered

13  insolvent by the transfer.  Debtor has not completed its investigation of potential preference,

14  fraudulent transfer or and other Avoidance Actions.  The Plan provides that all Avoidance

15  Actions will automatically be transferred to the Creditor's Trust on the Effective Date, at

16  which time the Trustee shall have the exclusive standing and authority to enforce, prosecute

17  and settle such avoidance actions.  If the Trustee elects to pursue any Avoidance Action, it

18  must file such Avoidance Action with the Bankruptcy Court on or before ~~February~~

19  ~~28~~April 15, 2010.  Any Avoidance Action that is not filed on or before ~~February 28~~April 15,

20  2010 shall be deemed to be released.  All expenses of pursuing any Avoidance Action shall

21  be Creditors' Trust Administrative Expenses.

22      **C.**    **LIABILITIES**

23          1.    <u>Bank of America</u>.  As of the Petition Date, Debtor owed B of A

24  approximately $15,564,161.  B of A has a security interest in all of Debtor's personal

25  property.  B of A also has a security interest in Debtor's real property located at 701 W. 8th

26  Street, Vancouver, Washington.

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1        Based upon appraisals and other information available to Debtor, Debtor

2  estimates that B of A's Collateral, including the DVP Note, has an approximate value of

3  $9,000,000.   The Plan provides that B of A will have an Allowed Secured Claim in the

4  amount of $9,000,000 that will be satisfied by delivery of a $9,000,000 promissory note to

5  B of A payable by Reorganized Debtor (the "B of A Note").  The B of A Note will accrue

6  interest at the rate of 5.25% per annum and will be paid in equal quarterly installments of

7  principal and interest based on a 30-year amortization schedule, with a balloon payment due

8  10 years after the Effective Date.  As security for the B of A Note, B of A will retain its

9  security interest in the Collateral securing its Secured Claim with the same priority that such

10  security interest had on the Petition Date.

11        B of A will retain a General Unsecured Claim in the amount of $6,500,000.

12        2.    <u>Administrative Expense Claims</u>.  Debtor has retained Tonkon Torp

13  LLP as its general counsel, The Mountain Group as a consultant, Miller Nash LLP as Special

14  Counsel, Davis, Wright, Tremaine LLP as Special Counsel and Moss Adams LLP as

15  accountants.  Although the following estimate is very preliminary and may vary greatly

16  depending on negotiations with B of A and the Unsecured Creditors' Committee, Debtor

17  anticipates it will incur approximately $300,000 in professional fees and expenses through

18  the Confirmation Date.  In addition, Debtor estimates that Allowed ~~§~~<u>Section</u> 503(b)(9)

19  Administrative Expense Claims will total approximately $190,000.  As discussed above,

20  Debtor has filed a motion with the Court seeking authority to immediately pay certain of

21  such §503(b)(9) Claims, and the motion is pending before the Court.

22        3.    <u>Unsecured Claims</u>~~.~~

23        3.1    <u>Subscriber Refunds</u>.  Debtor estimates that Subscriber Refund

24  Claims will total approximately $7,500.

25        3.2    <u>Small Unsecured Claims</u>.  Debtor estimates that Small

26  Unsecured Claims ($5,000 or less) will total approximately $90,000.

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

3.3    <u>General Unsecured Claims</u>.  Debtor estimates that General Unsecured Claims will range from approximately $8,400,000 to $9,900,000.

The total amount of General Unsecured Claims will depend in large part on what actions Debtor takes with respect to a major personal property lease Debtor has with General Electric Capital Corporation ("GE").  Debtor has two leases with GE – a packaging equipment lease and a furniture lease.  Debtor will reject the GE furniture lease, which will result in lease rejection damages of approximately $1,400,000.  Debtor is currently in negotiations with GE regarding possible lease modifications with respect to the packaging lease.  If those negotiations are successful, Debtor anticipates it will seek to assume the lease as modified.  However, if Debtor does not assume the packaging lease and such lease is rejected, Debtor estimates GE will have a General Unsecured Claim with respect to such lease rejection of approximately $1,500,000.  Accordingly, it is anticipated GE may have a total General Unsecured Claim ranging from approximately $1,400,000 to $2,900,000.

B of A will have a General Unsecured Claim of $6,500,000.  Debtor estimates that the amount of General Unsecured Claims of Creditors other than GE and B of A will total approximately $500,000.

3.4    <u>Subordinated Unsecured Claims</u>.  Debtor estimates that Subordinated Unsecured Claims (which will not receive anything under the Plan) are approximately $2,100,000.

## VI.    DESCRIPTION OF PLAN OF REORGANIZATION

### A.    BRIEF EXPLANATION OF CHAPTER 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  Under Chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its creditors, and equity holders.  In addition to permitting rehabilitation of the debtor, another goal of Chapter 11 is to promote equality of treatment of creditors and equity holders of equal rank with respect to the distribution of a debtor's assets.  In furtherance of these two

Page 27 of 50 ————DEBTOR'S FIRSTSECOND AMENDED DISCLOSURE STATEMENT (NOVEMBERDECEMBER 13, 2009) - 27 of 50
In re The Columbia Publishing Company, Case No. 09-43133-PBS

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1   goals, upon the filing of the reorganization under Chapter 11, Section 362 of the Bankruptcy

2   Code generally provides for an automatic stay of substantially all acts and proceedings

3   against the debtor and its property, including all attempts to collect debts or enforce liens that

4   arose prior to commencement of the debtor's case under Chapter 11.

5         The confirmation of a plan of reorganization is the principal objective of a

6   Chapter 11 reorganization case. A plan of reorganization sets forth the means for satisfying

7   claims against, and interests in, a debtor. Confirmation of a plan of reorganization by a

8   bankruptcy court makes the plan binding upon the debtor, any issuer of securities under the

9   plan, any person acquiring property under the plan, any creditor, and any equity holder of the

10   debtor. Subject to certain limited exceptions provided by the Bankruptcy Code, and except

11   as specifically provided in the plan of reorganization, the confirmation order discharges the

12   debtor from any debt that arose prior to the date of such confirmation and order and

13   substitutes therefor the obligations specified in the plan.

14

15     **B.**     **SOLICITATION, CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**

16         1   <u>General</u>. Pursuant to Section 1123(a)(1) of the Bankruptcy Code, a

17   plan of reorganization must designate classes of claims and classes of interests. Debtor's

18   Plan classifies all Claims and Interests into four Classes. The classification of Claims and

19   Interests is made for the purpose of voting on the Plan and making distributions thereunder,

20   and for ease of administration of the Plan. A Claim or Interest is classified in a particular

21   Class only to the extent the Claim or Interest qualifies within the description of that Class,

22   and is classified in a different Class to the extent the Claim or Interest qualifies within the

23   description of such different Class. A Claim or Interest is entitled to vote in a particular

24   Class and to receive distribution in such Class only to the extent such Claim or Interest is an

25   Allowed Claim or Allowed Interest in that Class and has not been paid prior to the Effective

26   Date. Under the Plan, a Claim or Interest is an Allowed Claim against Debtor or an Allowed

**Tonkon Torp**LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1   Interest in Debtor to the extent that (a) a proof of the Claim or Interest was (i) timely filed or

2   (ii) deemed filed under applicable law by reason of an order of the Bankruptcy Court; or (iii)

3   scheduled by Debtor on its Schedules of Liabilities as neither contingent, unliquidated, or

4   disputed; and (b) (i) no party in interest has filed an objection within the time fixed by the

5   Bankruptcy Court; or (ii) the Claim or Interest is allowed by Final Order; and (c) with respect

6   to an application for compensation or reimbursement of an Administrative Expense Claim,

7   the amount of Administrative Expense Claim of which has been approved by the Bankruptcy

8   Court.

9           2.      Unclassified Claims.  Administrative Expense Claims and Priority Tax

10  Claims are not classified.  An Administrative Expense Claim is a claim against Debtor

11  constituting an expense of administration of the Bankruptcy Case allowed under Section

12  503(b) of the Bankruptcy Code, including, without limitation, the actual and necessary costs

13  and expenses of preserving the estate and operating the business of Debtor during the case,

14  any indebtedness or obligations incurred by Debtor during the pendency of the case in

15  connection with the conduct of, the acquisition or lease of property by, or the rendition of

16  services to, Debtor, compensation for legal and other professional services, and

17  reimbursement of expenses and statutory fees payable to the United States Trustee.

18  Administrative Expense Claims also include claims made by suppliers of goods to Debtor for

19  the value of any goods sold to Debtor in the ordinary course of Debtor's business that were

20  received by Debtor within 20 days before the Petition Date (referred to in this Disclosure

21  Statement as Section 503(b)(9) Administrative Expense Claims).

22          A "Priority Tax Claim" is a claim of a governmental unit of the kind entitled

23  to priority under Section 507(a)(8) of the Bankruptcy Code.  Priority Tax Claims will be paid

24  as allowed in Section 1129(a)(9) within 30 days following the later of the Effective Date or

25  the date upon which the Priority Tax Claim becomes an Allowed Claim.

26

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1    Pursuant to the Plan, Administrative Expense Claims will be paid in full on

2    the later of the Effective Date or the date on which the Administrative Expense Claim

3    becomes an Allowed Claim; provided, however, that Administrative Expense Claims

4    representing liabilities incurred by Debtor in the ordinary course of business (including

5    amounts owed to vendors and suppliers that have sold products or furnished services to

6    Debtor after the Petition Date) will be paid in accordance with the terms and conditions of

7    the particular transactions, and any other agreements relating thereto.  Additionally, any

8    agreements between Debtor and holders of Allowed Administrative Expense Claims for

9    treatment other than payment in full on the date described above must be in writing.

10           3.     Classified Claims.  The following summary of distributions under the

11   Plan to Classified Claims is subject to, and is qualified in its entirety by reference to, the Plan

12   attached hereto as Exhibit 1.

13           a.     Class 1 – Other Priority Claims.  An "Other Priority Claim" is a claim

14   against Debtor entitled to priority under Section 507(a) of the Bankruptcy Code (other than

15   an Administrative Expense Claim or Priority Tax Claim).  Debtor is unaware of any unpaid

16   Other Priority Claims.  Pursuant to the Plan, unless otherwise agreed by any holder of an

17   Allowed Other Priority Claim, any holder of an Allowed Other Priority Claim shall be paid

18   the full amount of its Allowed Other Priority Claim on the later of the Effective Date or the

19   date such Claim becomes an Allowed Claim.

20           Class 1 is unimpaired and is not entitled to vote on the Plan.  The holders of

21   Class 1 Claims are conclusively presumed pursuant to Section 1126(f) of the Bankruptcy

22   Code to have accepted the Plan.

23           b.     Class 2 – B of A's Secured Claim.  Class 2 consists of the Allowed

24   Secured Claim of B of A.  B of A's Secured Claim will be Allowed in the amount of

25   $9,000,000, and will be satisfied by delivery of a $9,000,000 promissory note to B of A

26   payable by Reorganized Debtor (the "B of A Note").  The B of A Note will accrue interest at

**Page 30 of 50** ——DEBTOR'S ~~FIRST~~SECOND AMENDED DISCLOSURE
STATEMENT (~~NOVEMBER~~DECEMBER 1~~3~~, 2009) - 30 of 50
In re The Columbia Publishing Company, Case No. 09-43133-PBS

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

Case 09-43133-PBS   Doc 182-1   Filed 12/01/09   Entered 12/01/09 16:34:14   Page 30 of 50

| | |
|---|---|
| 1 | the rate of 5.25% per annum and will be paid in equal quarterly installments of principal and |
| 2 | interest based on a 30-year amortization schedule, with a balloon payment due 10 years after |
| 3 | the Effective Date.  As security for the B of A Note, B of A will retain its security interest in |
| 4 | the Collateral securing its Secured Claim with the same priority that such security interest |
| 5 | had on the Petition Date. |
| 6 | Class 2 is impaired, and B of A is entitled to vote on the Plan. |
| 7 | c. <u>Class 3 – Subscriber Refund Claims</u>.  Class 3 consists of all Allowed |
| 8 | Subscriber Refund Claims.  Subscriber Refund Claims are Unsecured Refund Claims of $100 |
| 9 | or less of subscribers (or past subscribers) of The Columbian or the Camas-Washougal Post- |
| 10 | Record.  Debtor estimates that the total amount of Subscriber Refund Claims will be |
| 11 | approximately $7,500.  Class 3 Claims will be paid in full within 30 days after the Effective |
| 12 | Date. |
| 13 | Class 3 is unimpaired and is not entitled to vote on the Plan.  Holders of Class |
| 14 | 3 Claims are conclusively presumed pursuant to Section 1126(f) of the Bankruptcy Code to |
| 15 | have accepted the Plan. |
| 16 | d. <u>Class 4 – Small Unsecured Claims</u>.  Small Unsecured Claims are |
| 17 | Allowed Unsecured Claims in the amount of $5,000 or less, or that have been reduced to |
| 18 | $5,000 by election of the holders thereof.  Debtor estimates that the total amount of the Small |
| 19 | Unsecured Claims will be approximately $90,000.  An election to reduce an Unsecured |
| 20 | Claim to $5,000 must be made in writing and served on counsel for Debtor on or prior to the |
| 21 | first date set for casting ballots to accept or reject the Plan.  Holders of Class 4 Claims will be |
| 22 | paid an amount equal to 60 percent of their Class 4 Claims within 30 days following the |
| 23 | Effective Date. |
| 24 | Class 4 is impaired and holders of Class 4 Claims are entitled to vote on the |
| 25 | Plan. |
| 26 | |

**Tonkon Torp**LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1         e.     <u>Class 5 – General Unsecured Claims</u>.  Class 5 consists of all Allowed

2  Unsecured Claims that are not otherwise classified in the Plan.  As set forth previously,

3  Debtor estimates that the total amount of General Unsecured Claims may range from

4  approximately $8,400,000 to $9,900,000.

5         The Plan provides that holders of Allowed General Unsecured Claims will be

6  paid Pro Rata from a Creditors' Trust established for the purpose of paying Allowed General

7  Unsecured Claims.  The Creditors' Trust will be established pursuant to the Plan and a

8  Creditors' Trust Agreement.  A copy of the Creditors' Trust Agreement is attached as an

9  exhibit to the Plan, which is attached as an exhibit to this Disclosure Statement.  The

10  Unsecured Creditors' Committee will serve as the Executive Board of the Creditors' Trust,

11  and will appoint the Trustee of the Creditors' Trust.

12         On the Effective Date, Reorganized Debtor shall execute and deliver to the

13  Creditors' Trust a $2,250,000 Term Note secured by a Deed of Trust on the Petlock Property.

14         The Term Note shall be paid in equal quarterly installments of $30,000 each,

15  with the first quarterly payment to be made on April 1, 2010 and subsequent quarterly

16  payments to be made on the first day of each calendar quarter thereafter, with a balloon

17  payment due ~~7~~seven years after the Effective Date.  In addition, in the event ~~that~~ Reorganized

18  Debtor, in its discretion, elects to sell all or any portion of the Petlock Property, Reorganized

19  Debtor shall promptly pay the net proceeds of such sale as a mandatory prepayment towards

20  any outstanding principal balance of the Term Note.

21         On the Effective Date, all Avoidance Actions shall automatically be

22  transferred to the Creditors' Trust, at which time the Trustee shall have the exclusive standing

23  and authority to enforce, prosecute and settle such Avoidance Actions.  If the Trustee elects

24  to pursue any such Avoidance Action, it must file such Avoidance Action with the

25  Bankruptcy Court on or before ~~February 28~~April 15, 2010.  Any Avoidance Action that is

26  not filed on or before ~~February 28~~April 15, 2010 shall be deemed to be released.  All

**Page 32 of 50** ------DEBTOR'S ~~FIRST~~SECOND AMENDED DISCLOSURE
STATEMENT (~~NOVEMBER~~DECEMBER 1~~3~~, 2009) - 32 of 50
In re The Columbia Publishing Company, Case No. 09-43133-PBS

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

Case 09-43133-PBS    Doc 182-1    Filed 12/01/09    Entered 12/01/09 16:34:14    Page 32 of 50

1  expenses of pursuing any Avoidance Action shall be Creditors' Trust Administrative

2  Expenses.  The Bankruptcy Court will retain jurisdiction over any Avoidance Action,

3  notwithstanding any Order closing the Chapter 11 Case.

4          The Trustee will from time to time make Pro Rata payments from available

5  Creditors' Trust Assets to the holders of Allowed Class 5 Claims.  The Trustee will make

6  distributions only to holders of Allowed Class 5 Claims.  No holder of a Disputed Claim will

7  receive any distribution on account of such Disputed Claim unless, until and to the extent that

8  such Disputed Claim becomes an Allowed Class 5 Claim.  When determining any Pro Rata

9  distribution to be made to a holder of an Allowed Class 5 Claim, the Trustee will assume that

10  each Disputed Class 5 Claim is an Allowed Class 5 Claim in an amount equal to the lesser of

11  (a) the amount of such Disputed Claim, (b) the amount estimated by the Bankruptcy Court in

12  respect of such Disputed Claim upon request by the Reorganized Debtor or the Trustee, or (c)

13  such other amount as may be agreed upon by the holder of such Disputed Claim and

14  Reorganized Debtor or the Trustee.  All amounts not distributed by the Trustee as a result of

15  the preceding will be reserved by the Trustee in a separate and segregated bank account (the

16  "Reserve Account") for the benefit of holders of Class 5 Claims.  Within 30 days after a

17  Disputed Class 5 Claim is Allowed or disallowed in whole or in part, any distributions

18  payable in respect of such Allowed Class 5 Claim will be paid from the Reserve Account to

19  the holder of such Allowed Class 5 Claim.  From time to time, and in no event later than 30

20  days following the allowance or disallowance of all Disputed Claims, the Trustee will, after

21  payment of Disputed Claims that have been Allowed, distribute funds remaining in the

22  Reserve Account on a Pro Rata basis to holders of Allowed Class 5 Claims.

23          Class 5 is impaired and holders of Class 5 Claims are entitled to vote on the

24  Plan.

25          f.    Class 6 – Subordinated Unsecured Claims.  Class 6 consists of the

26  Allowed Subordinated Claims of Scott Campbell and other Insiders for funds loaned by such

Page 33 of 50 - DEBTOR'S FIRSTSECOND AMENDED DISCLOSURE
STATEMENT (NOVEMBERDECEMBER 13, 2009) - 33 of 50
In re The Columbia Publishing Company, Case No. 09-43133-PBS

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

Case 09-43133-PBS   Doc 182-1   Filed 12/01/09   Entered 12/01/09 16:34:14   Page 33 of 50

1 Insiders to The Columbian.  Class 6 Claims total approximately $2,100,000.  Holders of

2 Class 6 Claims will not receive any property under the Plan on account of their Class 6

3 Claims.  Accordingly, pursuant to Section 1126(g) of the Bankruptcy Code, Class 6 is

4 deemed to have rejected the Plan.

5          g.     <u>Class 7 – Interests</u>.  Class 7 consists of Interest holders of Debtor.  The

6 Plan provides that holders of Class 7 Interests will receive or retain nothing in respect of their

7 Interests and that all Interests will be cancelled as of the Effective Date.  Accordingly,

8 pursuant to Section 1126(g) of the Bankruptcy Code, Class 7 is deemed to have rejected the

9 Plan.

10      The Plan further provides that on the Effective Date, Reorganized Debtor

11 will issue 500,000 shares of common stock to Scott Campbell in exchange for $500,000 Cash

12 to be paid by Scott Campbell (and/or a Campbell family trust and/or an immediate family

13 member of Scott Campbell) to Reorganized Debtor on or before the Effective Date.  In

14 addition to the shares to be issued to Scott Campbell (and/or a Campbell family trust and/or

15 an immediate family member of Scott Campbell), the Plan provides that on the Effective

16 Date any Creditor may purchase common stock in Reorganized Debtor in blocks of not less

17 than 50,000 shares for $1 per share provided that such Creditor has executed and delivered to

18 Debtor a signed subscription agreement on or before the Confirmation Date.

19      **C.**     **EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

20      The Bankruptcy Code gives Debtor the right, after commencement of its

21 Chapter 11 Case, subject to the approval of the Bankruptcy Court, to assume or reject

22 executory contracts and unexpired leases.  Generally, an "executory contract" is a contract

23 under which material performance (other than the payment of money) is still due by each

24 party.

25

26

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1    The Plan provides for the rejection by Debtor of all executory contracts and

2    unexpired leases that are not expressly assumed by the Plan or subject to a motion for

3    assumption filed on or before the Confirmation Date.

4    If an executory contract or unexpired lease is rejected, the other party to the

5    agreement may file a proof of claim for damages resulting from such rejection.  The Plan

6    provides that a proof of claim with respect to any such claim must be filed within 30 days of

7    the approval of the Bankruptcy Court of the rejection of the relevant executory contract or

8    unexpired lease.  Any such claim shall constitute a Class 4 Claim or Class 5 Claim to the

9    extent that such claim is finally treated as an Allowed Claim.

10    **D.    EFFECT OF CONFIRMATION**

11    1.    <u>Cancellation of Equity and Right to Purchase Stock</u>.  On the Effective

12    Date, all of Debtor's existing common stock will be cancelled.  The Plan provides that on the

13    Effective Date Reorganized Debtor will issue 500,000 shares of common stock to Scott

14    Campbell (and/or a Campbell family trust and/or an immediate family member of Scott

15    Campbell) in exchange for $500,000 Cash to be paid by Scott Campbell (and/or a Campbell

16    family trust and/or an immediate family member of Scott Campbell) to Reorganized Debtor

17    on or before the Effective Date.  In addition to the shares to be issued to Scott Campbell

18    (and/or a Campbell family trust and/or an immediate family member of Scott Campbell), the

19    Plan provides that on the Effective Date any Creditor may purchase common stock in

20    Reorganized Debtor in blocks of not less than 50,000 shares for $1 per share provided that

21    such Creditor has executed and delivered to Debtor a signed subscription agreement on or

22    before the Confirmation Date.  A form subscription agreement is attached as an exhibit to the

23    Plan, which is attached as an exhibit to this Disclosure Statement.

24    2.    <u>Discharge</u>.  The treatment of, and consideration received by, holders of

25    Allowed Claims and Interests pursuant to the Plan of Reorganization will be in full

26    satisfaction, release and discharge of their respective Claims against or Interests in Debtor.

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

The Confirmation Order shall discharge Debtor from any liability that arose before the Effective Date as provided in Sections 524 and 1141 of the Bankruptcy Code, and any debt and liability of a kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not: (a) a Proof of Claim based on such debt or liability is filed or deemed filed under Section 501 of the Bankruptcy Code; (b) a Claim based on such debt or liability is Allowed; or (c) the holder of the Claim based on such debt or liability has accepted the Plan.

3. <u>Revesting, Operation of Business</u>. All property of the estate shall revest in Reorganized Debtor on the Effective Date free and clear of all rights, claims, liens, charges, encumbrances and interests, except as otherwise provided in the Plan. Any liens on or security interests in property of the estate which secure post-petition Claims shall attach to such property on and after the Effective Date until such post-petition Claim has been satisfied in full.

Liabilities incurred in Debtor's purchase, lease, or use of goods and services in the ordinary course of its business, including Administrative Expense Claims for amounts due on account of services rendered to Debtor, including, without limitation, fees and expenses of professionals, after the Confirmation Date, shall be paid by Reorganized Debtor pursuant to the terms and conditions of the particular transaction giving rise to such Claims, without any further action by the holders of such Claims.

4. <u>Injunction</u>. Except as otherwise expressly provided in the Plan, all persons who have held, hold or may hold Claims, or who may have held, hold or may hold any Interest, are permanently enjoined from and after the Effective Date from (a) commencing or continuing in any manner any action or other proceedings of any kind with respect to any Claims or Interests against Reorganized Debtor; (b) enforcing, attaching, collecting or recovering by any manner or any means any judgment, award, decree or order against Reorganized Debtor; (c) creating, perfecting or enforcing any encumbrances of any kind against Reorganized Debtor with respect to any such Claim except as specifically set

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1  forth in the Plan; (d) asserting any setoff, right of subrogation or recoupment of any kind

2  against any obligation due to Debtor, Reorganized Debtor or their property; and (e)

3  proceeding in any manner in any place whatsoever that does not conform to, does not comply

4  with, or is inconsistent with the provisions of the Plan or the order confirming the Plan.

5          5.      Utility Deposits.  The Plan provides that all utilities holding a Utility

6  Deposit shall immediately after the Effective Date return or refund such Utility Deposit to

7  Reorganized Debtor.  At the sole option of Reorganized Debtor, Reorganized Debtor may

8  apply any Utility Deposit that has not been refunded to Reorganized Debtor in satisfaction of

9  any payments due or to become due from Reorganized Debtor to a utility holding such a

10 Utility Deposit.

11         6.      Modification of the Plan; Revocation or Withdrawal of the Plan.

12 Subject to Section 1127 of the Bankruptcy Code, Debtor reserves the right to alter, amend or

13 modify the Plan before its substantial consummation so long as the treatment of holders of

14 Claims and Interests under the Plan is not adversely affected.

15         7.      Retention of Jurisdiction.  Notwithstanding the entry of the

16 Confirmation Order or the Effective Date having occurred, or an Order closing the Chapter

17 11 Case, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out

18 of or relating to the Chapter 11 Case, including, but not limited to, the following matters:  (a)

19 resolve controversies and disputes regarding any avoidance action; (b) to hear and determine

20 any pending applications for the rejection of executory contracts or unexpired leases, and the

21 allowance of Claims resulting therefrom; (c) to determine any adversary proceedings,

22 applications, contested matters or other litigation matters pending on the Effective Date; (d)

23 to ensure that distributions to holders of Allowed Claims are accomplished; (e) to hear and

24 determine objections to or requests for estimations of Claims, including any objections to the

25 classification of any Claim, and to allow, disallow and/or estimate any Claim in whole or in

26 part; (f) to enter and implement such orders as may be appropriate in the event the

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1  Confirmation Order is for any reason stayed, revoked, modified or vacated; (g) to issue any

2  appropriate orders in aid of execution of the Plan or to enforce the Confirmation Order and/or

3  the discharge, or the effect of such discharge, provided to Debtor; (h) to hear and determine

4  any applications to modify the Plan, to cure any defect or omission or to reconcile any

5  inconsistency in the Plan or in any order of the Bankruptcy Court, including, without

6  limitation, the Confirmation Order; (i) to hear and determine all applications for

7  compensation and reimbursement of expenses of professionals under the Bankruptcy Code;

8  (j) to hear and determine disputes arising in connection with the interpretation,

9  implementation or enforcement of the Plan; (k) to hear and determine other issues presented

10  or arising under the Plan; (l) to hear and determine any other matters related hereto and not

11  inconsistent with Chapter 11 of the Bankruptcy Code; and (m) to enter a final decree closing

12  the Chapter 11 Case.

13          8.      United States Trustee Fees.  Reorganized Debtor shall be responsible

14  for timely payment of fees incurred pursuant to 28 USC § 1930(a)(6) until the case is closed,

15  converted or dismissed.  After confirmation, Reorganized Debtor shall serve on the United

16  States Trustee a monthly financial report for each month, or portion thereof, that the case

17  remains open.  The monthly financial report shall include a statement of all disbursements

18  made during the course of the month, whether or not pursuant to the Plan.

19  **VII.    LIQUIDATION ANALYSIS**

20          A Plan of Reorganization cannot be confirmed unless the Bankruptcy Court

21  finds that the plan is in the "best interest of creditors" of holders of claims against, and

22  interests in, the debtor subject to such plan.  The "best interest of creditors" test is satisfied if

23  the Plan provides each dissenting or non-voting member of each impaired Class with a

24  recovery not less than the recovery such member would receive if the debtor was liquidated

25  in a hypothetical case under Chapter 7 of the Bankruptcy Code by a Chapter 7 Trustee.  In

26  applying the "best interest" test, the Bankruptcy Court would ascertain the hypothetical

Page 38 of 50 ————DEBTOR'S FIRSTSECOND AMENDED DISCLOSURE
STATEMENT (NOVEMBERDECEMBER 13, 2009) - 38 of 50
In re The Columbia Publishing Company, Case No. 09-43133-PBS

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1    recovery in a Chapter 7 proceeding to secured creditors, priority claimants, general unsecured

2    creditors and equity interest holders.  The hypothetical Chapter 7 recoveries would then be

3    compared with the distribution offered to each Class of Claims or Interests under the Plan to

4    determine if the Plan satisfied the "best interest" test set forth in the Bankruptcy Code.

5    Debtor believes the Plan provides each dissenting or non-voting member of

6    each impaired Class with a recovery not less than the recovery such member would receive if

7    Debtor was liquidated in a hypothetical case under Chapter 7 of the Bankruptcy Code by a

8    Chapter 7 Trustee.

9    Exhibit 5 attached hereto sets forth Debtor's liquidation analysis.  Debtor

10   believes that conversion to a case under Chapter 7 would result in lower distributions being

11   received by Creditors and would result in significant delays in distributions to Creditors.

12   **VIII.   RISK FACTORS TO BE CONSIDERED**

13   Prior to voting on the Plan, each Creditor should carefully consider the risk

14   factors enumerated or referred to below, as well as all the other information contained in this

15   Disclosure Statement, the Plan, and the exhibits hereto and thereto.  The financial projections

16   included with this Disclosure Statement are dependent upon the successful reorganization of

17   Debtor, the continued implementation of Debtor's business plan, and the reliability of the

18   assumptions contained in the projections.  These projections reflect numerous assumptions of

19   the anticipated future performance of Reorganized Debtor, general business and economic

20   conditions, and other matters, most of which are beyond the control of Reorganized Debtor

21   and some of which may not materialize.  In addition, unanticipated events and circumstances

22   occurring subsequent to the preparation of the projections may affect the actual final

23   financial result of the Reorganized Debtor.

24   **IX.      CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**

25   CIRCULAR 230 DISCLAIMER:  TO ENSURE COMPLIANCE WITH

26   REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE, WE INFORM

Page 39 of 50 ———— DEBTOR'S FIRSTSECOND AMENDED DISCLOSURE
STATEMENT (NOVEMBERDECEMBER 13, 2009) - 39 of 50
In re The Columbia Publishing Company, Case No. 09-43133-PBS

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1  YOU THAT (A) ANY U.S. FEDERAL TAX ADVICE CONTAINED IN THIS

2  COMMUNICATION (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR

3  WRITTEN TO BE USED OR RELIED UPON, AND CANNOT BE USED OR RELIED

4  UPON, FOR THE PURPOSE OF (1) AVOIDING TAX-RELATED PENALTIES UNDER

5  THE INTERNAL REVENUE CODE OF 1986, AS AMENDED, OR (2) PROMOTING,

6  MARKETING OR RECOMMENDING TO ANOTHER PARTY ANY TRANSACTION

7  OR TAX MATTER(S) ADDRESSED HEREIN, AND (B) THIS DISCUSSION WAS

8  WRITTEN IN CONNECTION WITH DEBTOR SOLICITING ACCEPTANCES OF THE

9  PLAN THROUGH THIS DISCLOSURE STATEMENT.

10       A.       GENERAL TAX CONSIDERATIONS

11            The following discussion is a summary of certain material federal income tax

12  consequences expected to result from the consummation of the Plan.  This discussion is for

13  general information purposes only, and should not be relied upon for purposes of determining

14  the specific tax consequences of the Plan with respect to a particular holder of an Allowed

15  Claim or any Interest holder.  This discussion does not purport to be a complete analysis or

16  listing of all potential tax considerations.  This discussion does not address aspects of federal

17  income taxation that may be relevant to a particular holder of an Allowed Claim subject to

18  special treatment under federal income tax laws (such as foreign taxpayers, broker-dealers,

19  banks, thrifts, insurance companies, financial institutions, regulated investment companies,

20  real estate investment trusts and pension plans, and other tax-exempt investors), and does not

21  discuss any aspects of state, local or foreign tax laws.  Furthermore, this summary does not

22  address federal taxes other than income taxes.

23            This discussion is based on existing provisions of the Internal Revenue Code

24  of 1986, as amended (the "IRC"), existing and proposed Treasury Regulations promulgated

25  thereunder, and current administrative rulings and court decisions.  Legislative, judicial or

26  administrative changes or interpretations enacted or promulgated after the date hereof could

**Page 40 of 50** DEBTOR'S ~~FIRST~~SECOND AMENDED DISCLOSURE
STATEMENT (~~NOVEMBER~~DECEMBER 1~~3~~, 2009) - 40 of 50
In re The Columbia Publishing Company, Case No. 09-43133-PBS

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1    alter or modify the discussion set forth below with respect to the federal income tax

2    consequences of the Plan.  Any such changes or interpretations may be retroactive and could

3    significantly affect the federal income tax consequences of the Plan.  No ruling has been

4    requested or obtained from the Internal Revenue Service (the "IRS") with respect to any tax

5    aspects of the Plan and no opinion of counsel has been sought or obtained with respect

6    thereto.  This discussion is not binding on the IRS or the courts and no assurance can be

7    given that the IRS will not assert, or that a court will not sustain, a different position than any

8    position discussed herein.  No representations or assurances are being made to the holders of

9    Allowed Claims or the Interest holders with respect to the federal income tax consequences

10   described herein.

11           Accordingly, the following summary of certain federal income tax

12   consequences of the Plan is for informational purposes only and is not a substitute for careful

13   tax planning or advice based upon the individual circumstances pertaining to a particular

14   holder of an Allowed Claim or an Interest holder.  Each holder of an Allowed Claim and

15   each Interest holder is strongly urged to consult with its own tax advisors regarding the

16   federal, state, local, foreign, and other tax consequences of the Plan.

17           Any discussion of federal tax issues set forth in this Disclosure Statement was

18   written solely in connection with the confirmation of the Plan to which the transactions

19   described in this Disclosure Statement are ancillary.  Such discussion is not intended or

20   written to be legal or tax advice to any person and is not intended or written to be used, and

21   cannot be used, by any person for the purpose of avoiding any federal tax penalties that may

22   be imposed on such person.  Each holder of an Allowed Claim and each Interest holder

23   should seek advice based on its particular circumstances from an independent tax advisor.

24           **B.    FEDERAL INCOME TAX CONSEQUENCES TO DEBTOR**

25           Debtor is a corporation that has elected to be treated as an S corporation (as

26   defined in IRC Section 1361) for federal income tax purposes.  As an S corporation, Debtor

**Page 41 of 50** ————— DEBTOR'S ~~FIRST~~SECOND AMENDED DISCLOSURE
STATEMENT (~~NOVEMBER~~DECEMBER 1~~3~~, 2009) - 41 of 50
In re The Columbia Publishing Company, Case No. 09-43133-PBS

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1    is not itself generally subject to federal income tax. Instead, each Interest holder, as a

2    shareholder of Debtor, is required to include its pro rata share of the income, gain, loss, and

3    deduction recognized by Debtor in the Interest holder's own income tax returns.

4    Accordingly, since it is unlikely there will be any direct federal income tax liability at the

5    Debtor level, it appears there are no federal income tax consequences to Debtor under the

6    Plan except as discussed below. However, the S corporation election of Debtor will

7    terminate if an ineligible S corporation shareholder becomes a shareholder of Debtor.

8           Under the IRC, a taxpayer generally will recognize cancellation of debt

9    income ("COD Income") upon satisfaction of its outstanding indebtedness for consideration

10    less than the amount of such indebtedness. The amount of COD Income, in general, is the

11    excess of (a) the "adjusted issue price" of the satisfied indebtedness (in most cases, the

12    amount the debtor received on incurring the obligation, with certain adjustments), over (b)

13    the sum of the amount of cash paid and the fair market value of any new consideration given

14    in satisfaction of the indebtedness. However, IRC Section 108(a) provides an exception to

15    this income recognition rule (the "Bankruptcy Exception") where a taxpayer is in bankruptcy

16    and the discharge is granted, or is effected, pursuant to a plan approved by the bankruptcy

17    court. In the case of an entity taxable as a corporation, eligibility for the Bankruptcy

18    Exception is determined at the corporate level. If the Bankruptcy Exception applies (with the

19    effect that the taxpayer excludes COD Income from its gross income), the taxpayer is

20    required, under IRC Section 108(b), to reduce certain of its tax attributes by the amount of

21    COD Income excluded from gross income pursuant to the Bankruptcy Exception. The

22    attributes of the taxpayer that are reduced include any net operating loss for the taxable year

23    of the discharge (which, with respect to an S corporation, includes certain losses that have

24    been blocked at the shareholder level by the basis limitation rule), net operating loss

25    carryovers from prior years, general business and minimum tax credit carryforwards, capital

26    loss carryforwards, the basis of the taxpayer's assets, and foreign tax credit carryforwards.

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1  Except for the net operating loss and basis reductions, these attribute reductions generally

2  have limited application to S corporations.

3          Whether Debtor will realize any COD Income on the debt restructuring

4  contemplated by the Plan depends on whether the restructuring of any debt constitutes a

5  deemed taxable exchange of the underlying debt pursuant to IRC Section 1001 and the

6  corresponding Treasury Regulations.  For a deemed taxable exchange to occur with respect

7  to a debt, the modification to the debt must be "significant" as such term is defined in the

8  applicable Treasury Regulations.  If the modification to a debt obligation of Debtor is

9  "significant," Debtor will realize COD Income in an amount equal to the amount, if any, by

10  which the "issue price" of the new debt (i.e., the "modified debt") is less than the "adjusted

11  issue price" of the old debt.  The realization of COD Income by Debtor will result in tax

12  attribute reductions because of its exclusion under the Bankruptcy Exception.

13          Debtor will realize COD Income with respect to the restructuring of the Small

14  Unsecured Claims, General Unsecured Claims, and Subordinated Unsecured Claims.  As

15  discussed above, the COD Income realized by Debtor is excluded from Debtor's income by

16  the Bankruptcy Exception.  Debtor should not realize any COD Income with respect to the

17  restructuring of the B of A Secured Claim because the underlying debt as restructured will be

18  paid in full and the modified debt will bear "adequate stated interest."

19      **C.    FEDERAL INCOME TAX CONSEQUENCES TO CERTAIN**
20      **HOLDERS OF AN ALLOWED CLAIM**

21          In accordance with the Plan, the debt owed by Debtor to each holder of a

22  Small Unsecured Claim or General Unsecured Claim will be restructured.  If the

23  modification to the debt is "significant," as such term is defined in the applicable Treasury

24  Regulations, the modified debt will be treated as received by such holder in a deemed taxable

25  exchange of the underlying debt pursuant to IRC Section 1001.

26

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

With respect to a deemed taxable exchange, a holder of a Small Unsecured Claim or General Unsecured Claim will generally recognize gain or loss equal to the difference between the "amount realized" by the holder on the exchange and the holder's adjusted tax basis in its debt.  The amount realized will equal the sum of the amount of cash and the fair market value of other property (including the fair market value of a holder's proportionate share, if any, in the assets transferred by Debtor to the Creditors' Trust) received in the deemed taxable exchange.  With respect to modified debt that is treated as received in a deemed taxable exchange (e.g., the Term Note), fair market value generally equals its "issue price."  The tax consequences of a deemed taxable exchange (including the determination of whether any gain or loss recognized will be long-term or short-term capital gain or loss, or ordinary income or loss) depends upon factors specific to each holder of an Allowed Claim, including but not limited to:  (1) whether the Claim (or a portion thereof) is attributable to principal or interest, (2) the origin of the Claim, (3) whether the holder of the Claim reports income on the accrual or cash basis method, and (4) whether the holder of the Claim has taken a bad debt deduction or otherwise recognized a loss with respect to the Claim.

The principal amount of certain restructured debt may include accrued but unpaid interest.  A holder of an Allowed Claim not previously required to include in its taxable income any accrued but unpaid interest on such Claim may be treated as receiving taxable interest to the extent the modified debt received is allocable to such accrued but unpaid interest.

The amount realized with respect to a deemed taxable exchange of a Small Unsecured Claim or General Unsecured Claim is likely to be less than its adjusted tax basis.  Accordingly, a holder of such a claim will generally recognize a loss on the deemed taxable exchange.  The holders of Subordinated Unsecured Claims will not receive any distributions

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1    under the Plan.  Such holders will generally recognize a loss in the amount of the holder's

2    adjusted tax basis in its Claim.

3    **D.    CONSEQUENCES TO THE INTEREST HOLDERS**

4    Pursuant to the Plan, all of the currently outstanding shares of common stock

5    of Debtor, which shares constitute all of the equity interests of Debtor, shall be deemed

6    cancelled and shall be of no further force and effect, whether surrendered for cancellation or

7    otherwise, and there shall be no distribution with respect to such shares.

8    **E.    CREDITORS' TRUST**

9    Pursuant to the Plan, the holders of Allowed General Unsecured Claims are

10   required, for federal tax purposes, to treat the assets transferred by Debtor to the Creditors'

11   Trust as having been transferred directly by Debtor to such holders (with each such holder

12   receiving an undivided interest in the assets transferred by Debtor to the Creditors' Trust),

13   and then transferred by such holders to the Creditors' Trust in exchange for beneficial

14   interests therein.

15   The Creditors' Trust is intended to qualify as a liquidating trust.  As such, the

16   Creditors' Trust is not a separate taxable entity but rather is treated for federal tax purposes as

17   a "grantor" trust.  The Debtor, Trustee and the holders of Allowed General Unsecured Claims

18   will treat the Creditors' Trust as a grantor trust of which such holders are the owners and

19   grantors.  Accordingly, each such holder (as an owner of a beneficial interest in the Creditors'

20   Trust) will be required to report on its federal income tax returns the holder's allocable share

21   of any income, gain, loss, deduction or credit recognized by the Creditors' Trust.

22   The deemed transfer of assets by Debtor to the holders of Allowed General

23   Unsecured Claims will result in the recognition by the Debtor of gain or loss based on the

24   difference between the fair market value and the adjusted tax basis of the assets deemed

25   transferred.

26

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

## F. INFORMATION REPORTING AND BACKUP WITHHOLDING

Certain payments, including the payments with respect to Claims pursuant to the Plan, are generally subject to information reporting by the payor to the IRS. Moreover, under certain circumstances, a holder of a Claim may be subject to "backup withholding" with respect to payments made pursuant to the Plan, unless such holder either (1) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact, or (2) provides a correct United States taxpayer identification number and certifies under penalty of perjury that the holder is a United States person, the taxpayer identification number is correct, and that the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against the holder's United States federal income tax liability, and the holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS.

## G. IMPORTANCE OF OBTAINING PROFESSIONAL TAX ASSISTANCE

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER OF AN ALLOWED CLAIM OR THE INTEREST HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, EACH HOLDER OF AN ALLOWED CLAIM AND THE INTEREST HOLDER IS URGED TO CONSULT ITS TAX ADVISOR ABOUT

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

THE FEDERAL, STATE, LOCAL, AND APPLICABLE FOREIGN, INCOME AND
OTHER TAX CONSEQUENCES OF THE PLAN.

### X.     ACCEPTANCE AND CONFIRMATION OF THE PLAN

#### A.     CONFIRMATION HEARING

The Bankruptcy Court has scheduled a hearing on confirmation of the Plan on January 13, 2010 at 9:00 a.m. Pacific Time.  The hearing will be held at the United States Bankruptcy Court for the Western District of Washington, 117 Pacific Avenue, Tacoma, Washington 98402, before the Honorable Paul B. Snyder, United States Bankruptcy Judge.  At that hearing, the Bankruptcy Court will consider whether the Plan satisfies the various requirements of the Bankruptcy Code, including whether it is feasible and whether it is in the best interest of Creditors and Interest holders of Debtor.  Debtor will submit a report to the Bankruptcy Court at that time concerning the votes for acceptance or rejection of the Plan by the parties entitled to vote thereon.  Any objection to confirmation of the Plan must be timely filed as stated above.

#### B.     REQUIREMENTS OF CONFIRMATION

At the hearing on confirmation, the Bankruptcy Court will determine whether the provisions of Section 1129 of the Bankruptcy Code have been satisfied.  If all the provisions of Section 1129 are met, the Bankruptcy Court may enter an order confirming the Plan.  Debtor believes the Plan satisfies all the requirements of Chapter 11 of the Bankruptcy Code, that it has complied or will have complied with all the requirements of Chapter 11, and that the Plan has been proposed and is made in good faith.

The Best Interests of Creditors – Liquidation Alternative.  Notwithstanding acceptance of the Plan by each impaired Class, to confirm the Plan the Bankruptcy Court must determine that the Plan meets the requirements of Section 1129(a)(7) of the Bankruptcy Code; that is, that the Plan is in the best interests of each holder of a Claim or Interest in an

Page 47 of 50 - DEBTOR'S FIRST SECOND AMENDED DISCLOSURE STATEMENT (NOVEMBER DECEMBER 13, 2009) - 47 of 50
In re The Columbia Publishing Company, Case No. 09-43133-PBS

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1    impaired Class that has not voted to accept the Plan. Accordingly, if an impaired Class does

2    not unanimously accept the Plan, the "best interests" test requires that the Bankruptcy Court

3    find that the Plan provides to each holder of a Claim or Interest in such impaired Class a

4    recovery on account of the holder's Claim or Interest that has a value at least equal to the

5    value of the distribution each such holder would receive if Debtor was liquidated under

6    Chapter 7 of the Bankruptcy Code. In the opinion of Debtor, confirmation of the Plan is in

7    the best interests of the holders of Claims and Interests.

8            Debtor believes Chapter 7 liquidation would result in a diminution in the

9    value to be realized by holders of Claims and Interests due to, among other factors, (1) the

10   loss of the going concern value of Debtor's assets; (2) additional costs and expenses in the

11   appointment of a Chapter 7 trustee and attorneys, accountants and other professionals to

12   assist such trustee in the Chapter 7 case; and (3) additional expenses and Claims, some of

13   which would be entitled to priority in payment, which would arise by reason of the

14   liquidation. In a liquidation, Debtor would incur additional Claims resulting from the

15   rejection of all of Debtor's leases and executory contracts that would necessarily occur if

16   Debtor ceased operations. Consequently, Debtor believes the Plan, which provides for the

17   continuation of Debtor's business, will provide a greater ultimate return to Creditors than

18   would a Chapter 7 liquidation.

19           At the confirmation hearing, the Bankruptcy Court will determine whether the

20   holders of impaired Claims and Interests receive a distribution under the Plan that is at least

21   as great as the distribution such holders would receive upon liquidation of Debtor pursuant to

22   Chapter 7 of the Bankruptcy Code.

23           Feasibility of the Plan. Debtor believes confirmation of the Plan is not likely

24   to be followed by the liquidation of Reorganized Debtor or a need for a further financial

25   reorganization of Reorganized Debtor. The projections of Debtor's post-confirmation

26   business, attached hereto as Exhibit 4, show sufficient earnings and cash flow from

**Page 48 of 50** ———— DEBTOR'S ~~FIRST~~SECOND AMENDED DISCLOSURE
STATEMENT (~~NOVEMBER~~DECEMBER 1~~3~~, 2009) - 48 of 50
In re The Columbia Publishing Company, Case No. 09-43133-PBS

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1 operations to support and meet the ongoing financial needs of Reorganized Debtor. The

2 projections indicate that the Plan, as proposed by Debtor, is feasible and that Reorganized

3 Debtor will be financially viable after confirmation of the Plan.

4       **C.**    **CRAM DOWN**

5       The Bankruptcy Court may confirm the Plan, even if it is not accepted by all

6 impaired Classes, if the Plan has been accepted by at least one impaired Class of Claims, and

7 the Plan meets the cram down requirements set forth in Section 1129(b) of the Bankruptcy

8 Code. In the event any impaired Class of Claims does not accept the Plan, Debtor hereby

9 requests the Bankruptcy Court to confirm the Plan in accordance with Section 1129(b) of the

10 Bankruptcy Code or otherwise permit Debtor to modify the Plan.

11       **D.**    **ALTERNATIVES TO CONFIRMATION OF THE PLAN**

12       If the Plan is not confirmed, Debtor or another party in interest may attempt to

13 formulate or propose a different plan or plans of reorganization. Such plans might involve a

14 reorganization and continuation of Debtor's business, a sale of Debtor's business as a going

15 concern, an orderly liquidation of Debtor's assets, or any combination thereof. If no plan of

16 reorganization is determined by the Bankruptcy Court to be confirmable, the Chapter 11 case

17 may be converted to a liquidation proceeding under Chapter 7 of the Bankruptcy Code.

18       In a liquidation, a Chapter 7 Trustee would be appointed with the purpose of

19 liquidating the assets of Debtor. Typically, in a liquidation, assets are sold for less than their

20 going concern value and, accordingly, the return to Creditors and Interest holders is less than

21 the return in a reorganization, which derives the value to be distributed in a Plan from the

22 business as a going concern. Proceeds from liquidation would be distributed to Creditors and

23 Interest holders of Debtor in accordance with the priorities set forth in the Bankruptcy Code.

24       Debtor believes there is no currently available alternative that would offer

25 holders of Claims and Interests in Debtor greater value than the Plan and urges all parties

26 entitled to vote on the Plan to vote to accept the Plan.

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

XI.    CONCLUSION

Please read this Disclosure Statement and the Plan carefully.  After reviewing all the information and making an informed decision, please vote by using the enclosed ballot.

DATED this 1~~3th~~st day of ~~November~~December, 2009.

Respectfully submitted,

THE COLUMBIAN PUBLISHING COMPANY

By */s/ Scott Campbell*_____
    Scott Campbell, President

TONKON TORP LLP

By */s/ Michael W. Fletcher*_____
    Albert N. Kennedy, WSBA No. 15074
    Timothy J. Conway, Admitted *Pro Hac Vice*
    Michael W. Fletcher, Admitted *Pro Hac Vice*
    Attorneys for Debtor

**Page 50 of 50** - - - - - - - - DEBTOR'S ~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT (~~NOVEMBER~~DECEMBER 1~~3~~, 2009) - 50 of 50
In re The Columbia Publishing Company, Case No. 09-43133-PBS

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440